May it please the Court, my name is Dale Dixon, and I represent Petitioners Ronan Telephone Company and Hot Springs Telephone Company. I plan to reserve four or five minutes of my time for rebuttal. I'll try to keep track of your time, because I won't be able to tell you. I will certainly do that. One of the biggest problems with the T-Mobile order is seen in paragraph 16 of that order. And in paragraph 16, the FCC said that in light of our decision to prohibit the use of tariffs to impose termination charges for non-access traffic, we find it necessary to ensure that the LECs have the ability to compel negotiations and arbitrations. And when they used the term LECs, they didn't use the term CLECs, which are the competitive carriers. They didn't use the term RLECs for the rural carriers. They didn't use incumbent LECs. They used local exchange carriers, which encompasses all local exchange carriers. But they went on to say, Accordingly, we amend section 20.11 of our rules to clarify that an incumbent LEC may request interconnection from a CMRS provider. And the CMRS providers are the wireless providers. So in those two sentences, the FCC recognized that this was an issue that applied to local exchange carriers across the country. Kagan, I'm baffled by why you're arguing this issue. I mean, you're arguing about the CLECs, which you're not one of. Is that right? Ronan has CLEC entities that have been in existence and have been affected by this rule. Before 2005, they were in existence in Wyoming, in Montana. The Western Montana Community TEL is an affiliate of Ronan. But not in Oregon. Pardon me? Not in Oregon. Not here. Not in Oregon. Does that matter? They are not part of that appeal. But by creating this rule, the FCC took away the rural exemption for Ronan and Hot Springs, and the rural exemption said that rural carriers like Ronan and Hot Springs do not have to engage in negotiations and arbitrations, cannot be compelled to do so. And that was an exemption that was created by Congress and was overridden by the FCC in the T-Mobile order. All right. So I have some questions about that. First of all, does the order say that you have to negotiate even if there's no ‑‑ I mean, I gather you can get an exemption from ‑‑ or the rural exemption, so to speak. But does it preclude ‑‑ does it say that even without that exemption, you still have to do this? The exemption is the default. The exemption is what is in place for a company like the ‑‑ for companies like the Petitioners. Except the State POC can override it. Right. When there is a request by an interconnecting carrier, in this particular instance, it would be the CMRS providers who would say ‑‑ Right. Does the order eliminate the requirement that there be an override? It says that as soon as ‑‑ that they have to ‑‑ that the ILEX, including the rural EX, would have to request negotiations. The practical effect of this is that the CMRS providers had no intention and no desire to request negotiations. So because they could terminate the traffic free, absent a negotiated contract, which is what happened, particularly with Ronan and Hot Springs, the traffic was terminated from 2005 to 2007 with no compensation, because Ronan and Hot Springs believed and still believe that to request those negotiations was to immediately waive their rural exemption. Eventually, in 2007, Ronan and Hot Springs entered into a couple of different interconnection agreements, so they received compensation. But the way the rule was written, from 2005 to 2007, they received no compensation at all. And for rural carriers like Ronan and Hot Springs, that was the norm, and for the competitive carriers, it was no compensation at any time, absent a negotiated agreement. Why has this case been sitting around so long? I believe there has been an evolving series of orders at the FCC dealing with intercarrier compensation in general. There was a 2011 intercompensation or intercarrier compensation. This case is from the 2005 order, right? Yes. And it's 2013. It is 2013. And the petition was timely found and has just been sitting here? I believe there were agreed to or stipulated continuances of the petition, as the FCC said they were going to be dealing further with CMRS and LEC intercarrier compensation in an order to be released. And that order was released six years later. As part of their briefs, the FCC points to the fact that the CMRS issue, as it relates to LECs and as it relates to CLECs, isn't finished, that they still have plans to adapt these rules. For those carriers, though, it's 2013, and since 2005 they've received not a penny. The ---- One other question is, the ---- I think that the FCC's answer to what you just said about the rural exemption is that there's always the fallback. There was a default bill-and-keep rule. So you don't have to negotiate because you can always have the bill-and-keep rule. Was there a default bill-and-keep rule at that point, or was that from the 2011 order? There was a default bill-and-keep rule. If you look at footnote 57 of the 2005 order, it said once negotiations are requested ---- until negotiations are requested, there's no compensation. It's bill-and-keep, which is why from 2005 to 2007, Petitioners received no compensation. I know that the FCC stated in its brief that bill-and-keep was not something that was ordered until 2011 in the Connect America fund order, but footnote 57 clearly says that it's a bill-and-keep. It may not use the word bill-and-keep, but it says there's no compensation for the traffic exchange between the parties until a negotiation is requested. The ultimate relief, really, that Ronan and Hot Springs would request in the solution for this problem, which is eight years old now, is that the FCC would clarify this order, ruling that all carriers, all local exchange carriers' tariffs as filed with the until 2005, until the effective date of the T-Mobile order, and that on a going forward basis, the States would have the authority to set those rates. The problem with the States being granted the authority to set the rates according in this order, in California as a good example, a case went to the California PUC after an FCC decision, and the FCC said the State can decide what the rate's going to be. And this was a CLEC and a wireless provider. It was the Metro PCS case. They said the State can decide what the rate's going to be between the CLEC and the CMRS provider. The State, during a time when it really didn't have much of a budget, said if we're going to dedicate the resources, if we're going to dedicate the staff and we're going to do this rate-making, we have to have some assurances from the FCC that our rate is going to be approved, that it's going to be accepted. And the FCC said, no, we hold ultimate authority to decide the rate you come up with is not just and reasonable. So on the one hand, you have the FCC saying, we give the States the authority to determine what this rate is going to be. Through this arbitration system, is that right? Through a negotiation and arbitration system? Yes. Okay. So on the one hand, you have the FCC saying to the States. Not through a tariff. Not through the? I'm sorry. Not through a tariff. When they say the State can do it, that doesn't mean that it can do a tariff. No. The FCC clarified and was very specific that the States could come up with a rate, but they could do it any way they wanted to other than a tariff. And as was pointed out in the briefs, Section 251b-5 refers to arrangements for reciprocal compensation. And there are other sections in the Act which, as examples of arrangements, say contracts and tariffs. The FCC took this term arrangements in the plural and reduced it to a single option, an individually negotiated contract. I know there are arguments that have been made that following a tariff that's filed, following all the tariffs filed in 50 different States is time-consuming and the wireless providers didn't have the ability to keep track of all that. But the tariffs aren't unilaterally filed. They're unilaterally filed, but the opportunity to oppose them, the opportunity to protest them, exists when that tariff is filed at the PUC. You can claim at that point that the rate that's been tariffed is not just unreasonable. Now, for the going forward portion that I was talking about for a solution, the FCC could clarify to the States that they can come up with a rate, that their rate is the rate that would be set. For those carriers who entered into interconnection agreements, I think you end up with a couple categories of carriers. You end up with the LECs who negotiated agreements with the CMRS providers, and those interconnection agreements would be affected. Those rates, everyone who has an agreement would be stuck with that rate. But for those carriers, like Ronan and Hot Springs, who for 2005 to 2007 had no tariff, they had no contract, they had no rate, they received no compensation. So where this case at this point is only about 2005 to 2007, in terms of there being any, because there are settlements after that, is that what you're telling us? There are. The brief said that. There are interconnection agreements after 2007. But there's an entire class of carrier who was not, who has no interconnection agreement. Ronan and Hot Springs, CLEC entities. For example, CLECs who came into existence in 2007 have, they had no ability. I mean, to go back to where you started from, you've, there, the claim is that you have no standing as, with regards to the CLEC issue. You're saying that you do have CLECs, but you didn't say that in the briefs. Right. My understanding is all you've ever said about that is you're planning to have CLECs. The CLECs have existed. The plans for the voice services have been delayed in some instances. Plans for which? For voice services. The CLECs provide some other services. I mean, the company exists, but you're not actually providing services. They provide non-voice service. They provide Internet service. They provide cable service. It isn't subject to these rules. That is not. That's correct. You have no organizations that are subject to these rules. Correct. Other than, no CLEC services. Other than the CLEC entities who are affiliates of the company. What does that mean? There are no other CLECs who are participating in this case other than the argument that Ronan and Hot Springs have CLEC entities. Which are providing these services. Which are not providing services, yes. I'm going to reserve the balance of my time for rebuttal. Thank you. Good morning, Your Honors. May it please the Court. My name is Richard Welch, and I represent the FCC in this matter. We hope to cede five minutes of our time to our supporting intervener. I think it might help if I took a couple of minutes and tried to outline the problem that was facing the FCC, which will hopefully help you evaluate the solution that the FCC came up with. Well, I think we understand the problem, and I think, at least I do, and I think we understand why it came up with the solution. But I have some problems about how that solution accords with the statute. I'll be happy to address that. Okay. Well, they are alleging that we don't have the authority to adopt this rule that bars the use of tariffs to recover compensation. The FCC clearly has that authority. Congress in the Communications Act granted broad authority to the Commission in Section 201B to adopt rules to implement the provisions generally. And the Supreme Court has made clear in the AT&T v. Iowa Utilities Board case that rulemaking power extends to Section 251B provisions, like 251B-5. And it's not going to go beyond whatever the statute has. In other words, I don't see how 201B helps you. It just says you can implement the statute. But the question is what does the statute say? And it has that general rulemaking authority. And independently, Congress also gave the Commission authority over interconnection between wireless carriers and wireline carriers. I'm going to try to avoid the jargon, if I can. It's hard to do in the telecom context. 201A gives the Commission broad authority over this type of interconnection and associated charges generally for all carriers. And in particular relevance to this case, Section 332C, which is a provision expressly applies to wireless carriers, gives the FCC authority over interconnection between wireless and wireline carriers. So those provisions, we think, gave the FCC the authority to implement this rule. Now, the provision that we're talking about here, Section 251B-5, talks about a duty to establish arrangements for the – for reciprocal compensation for terminating this traffic. And your order – this is why I find – I guess my two problems are this. One is that your order recognizes that that term can encompass tariffs, which is why you did not retroactively – you said there was no retroactive problem. So then the question is why, if it can encompass tariffs, you have the authority to nonetheless say that it should encompass tariffs. I think our position is – I'm sorry, go ahead. The other issue is how this accords with the rural exemption. Okay. Sure. I'll be glad to address both of those. It is – the Commission did make the position that that unadorned term arrangements is broad enough in certain circumstances to include tariffs. But it's not required. Congress did not unambiguously tell the FCC that tariffs were to be one of the permissible types. So while it's permitted, it's not required. A good example of the – I'm sorry. So are you saying – is the structure of what this order is, is essentially we are now interpreting the term arrangements as a legal matter under Chevron, not to include tariffs? Are you doing something discretionary, saying even though these – this term includes tariffs, we from somewhere else have the authority to preclude the use of tariffs, even though the term includes tariffs? Which one are you saying? Well, we think our power under 201 and 332 gives us the ability to implement and delineate the contours of 251b-5 in the term arrangements. And so on a going-forward basis, the Commission said that tariffs will not be permitted in the future. Meaning that we're interpreting the term arrangements in the statute not to include tariffs, or meaning that – do you see the difference? Meaning that although the term includes tariffs, we, for policy reasons and not as an interpretive matter, are – and from an authority from somewhere else in the statute, maybe 201 or something else, are saying we're not going to let you use something even though it is an arrangement for purposes of the statute. Well, I think we're interpreting the term arrangements in 251b-5. Why haven't you done that? Well, because Congress did not specify in the statute the types of arrangements that would be permissible. And I think it's useful to contrast that with the statute that would be permissible. But that's different from saying it's not an arrangement. You're saying it is an arrangement, but we're not going to let you use it. Well, I think – I think Congress gave us, delegated to us the discretion to determine what types of arrangements will or will not be permitted. And I think the Commission, when it looked backwards in relation to the declaratory ruling, looked at the statute, said it didn't – it didn't delineate what arrangements were permitted, and our rules at the time, prior to 2005, did not say what types of arrangement were or were permitted. And so in those circumstances, the Commission concluded that it would not be unlawful to use them in the past. I think a plausible way to read that is the Commission was saying it would be unfair to penalize people for using tariffs when they had not been prohibited by the FCC. But it looked at this arrangement, and the problem is, in this particular context, tariffs are a very blunt instrument. The person who files the tariff, in this case the rural local telephone company, unilaterally dictates the terms of the agreement with the other carrier. They are in control. They're in a dominant position. They're driving the bus. And the problem was that the wireless providers came to the FCC and they said the rates that they are unilaterally dictating to us in these tariffs are grossly excessive. There was evidence in the record that said they went from anywhere to $0.02 to $0.08 a minute. There was even one egregious example where somebody was charging $0.15 per minute. Normally, when these agreements are negotiated between the parties, the revenue that – rate that they come up with is a fraction of a penny. So the system had gotten out of whack. That was the problem. The FCC, what was the solution to that problem? It decided, okay, on a going forward basis, we're going to do away with tariffs, because that has put, you know, too much power in the hands of one person to unilaterally dictate the terms of the agreement. We're going to move to negotiated agreements, which, after all, is the basic thrust of the 1996 Telecom Act, privately negotiated agreements. But in order to make that happen, we also have to make sure that the local telephone companies can force the wireless companies to come to the table and bargain with them. That was the solution that the FCC came up with. I suggest it was a lawful and reasonable solution to the problem. You – I'm sorry. Well, again, where I started from, this all sounds perfectly sensible, but the question is, does it comport with the statute? And that's where I'm having a harder time. And I guess our answer is the statute does not unambiguously tell the FCC that tariffs have to be permitted in these circumstances. And because they didn't delineate that – What about the rural exemption? Can you walk us through how you think that works, first of all, and then why it comports with the statute? Right. The rural exemption is a shield for rural carriers. And it basically says, if another carrier comes to you, a competitor, and asks you to perform some of the duties in Section 251B or C, like unbundle network elements or interconnection or resale, you can say no. I'm not going to negotiate with you. I don't have to deal with you, unless and until the State terminates the exemption and tells me that I have to. That shield was there in place the day before the FCC issued this order, and it remained untouched in place the day after the FCC issued the T-Mobile order on review. So they don't have to negotiate, but they can't have tariffs, so how are they supposed to set rates? Well, if — just to make sure we understand on the rural exemption, if someone tries to force them to negotiate, they don't have to. But if they want to obtain compensation in this context for this type of traffic from a wireless provider, then they have a choice. They can negotiate on their own motion, or they can decide we're going to look elsewhere to recover this compensation. The statute doesn't say where the compensation has to come from. People can bargain all sorts of different ways. So our position is the rural exemption is the best way to go. I mean, it does define — it does say in the regulations that talk about what a reciprocal compensation arrangement is, and they seem to be talking about arrangements where there is payment for termination. Each side is paying for each other's termination. There's a regulation that seems to say that. But people — yes. But that's what CAST 11 there was, anyway. That's right. But people can enter into agreements and do anything they want without regard to the provisions of the statute or the FCC's implementing rules. That's a good question, Buddy. What is it that the exemption leaves that's different for rural companies than for all others? What benefit do they now have under the exemption? If someone, again, as before this order, if someone, a competitor comes to them and tries to force them to provide things under 251B and C, they can say, no, I don't have to do it. And the State maintains its role over that provision and can decide whether or not to terminate it if someone asks. So that's all remained untouched. The other point to make about the rural exemption is that it's different from the other other non-rural companies. That's right. That's exactly right. But as a functional matter, what that means, and this is another thing I'd like you to help me with, is that they can't, if they don't negotiate, they can't get compensation. Well, if they want compensation from another carrier, they have to negotiate. Right. So what kind of an exemption is it that says that you don't have to negotiate, but if you don't negotiate, you have to give away your services for free? It allows you to fend off requests from other carriers. The other point to make is by doing what? I'm sorry? By doing what? I'm sorry, sir. By doing what? They don't have to negotiate if people come at them. I think the other point to make is that they don't have to provide the service unless the State terminates the exemption. That remains in place. The other thing, the point to make about the rural exemption, I think, is that even when it's in place, it only shields you from the duties under C, the seven duties under 251C. The duty, it does not shield the rural telephone companies from the duties under 251B, and in particular, the one we're talking about today, 251B-5, arrangements for reciprocal compensation. Just real quickly, a couple of questions you had asked, Judge Bergeron. You asked why this case took so long. Parties, competitive carriers, came to the FCC and filed petitions for the exemption for reconsideration of the 2005 order, and we asked the Court to hold the case in abeyance, I think with the agreement of the Petitioners here, while the Commission worked on that. Now, the Commission was also engaged in this larger rulemaking about inter-carrier compensation generally. It folded it into that rulemaking and came out with the order in 2011. At that point, we came to the Court and said the Court's now ready to be docketed, and the Petitioners asked the Court to further hold the case in abeyance for reasons that I don't understand. And the Court denied that request. I'm not sure what the relevance of this is, but you say that the rural exemption is not an exemption from B, but it specifically says it is. It says that it's not a rural exemption. I'm sorry, the – it requires – let me get the language in front of me. Well, I guess the point I'm trying to make is it exempts the requirement for them to negotiate in good faith with a requesting carrier appears in 251F – excuse me, 251C1. The duty to negotiate. The rural exemption shields them from having to perform that duty. That duty, it talks about 251C1, it talks about negotiating agreements to fulfill the duties in Section B and Section C. But the actual substantive duty to engage in arrangements for reciprocal compensation appears in B. So they're saying that they – the rural exemption shields them from having to negotiate, but the substantive obligation appears in B and that remains intact. Which is the rural exemption? What's the number? I'm sorry? What's the statute that's the rural exemption? 251F1 is where it appears. F1. And you'll see that it talks about – I see. Okay. All right. Now, can we – one other thing that is only of marginal relevance here but I'm confused about is you keep saying in your briefs that the bill-and-keep system is compliant with the reciprocal compensation and is not a no-payment system, but I don't understand that. Well, okay. First of all, I need to make clear that the lawfulness of reciprocal is not before court here. I understand that, up to a point. But as a practical matter, if the only – the default if the rural – in the rural exemption situation is something that's not called bill-and-keep, but it's tantamount to that, right? The reason why it is a lawful – a lawful implementation of the statute is in 252D2Bi. I hope I got that right. 252D. I know there's an – And basically Congress in that provision says when you're implementing this scheme of negotiated agreements and reciprocal compensation, it included a rule of construction, and it said that arrangements that afford the mutual recovery of the cost through the offsetting of reciprocal obligations, including arrangements that waive mutual recovery, such as bill-and-keep arrangements, are permissible. Well, right, but isn't the assumption of that that there's some kind of, you know, keeping of accounts such that you're simply – instead of exchanging the money, you're simply looking to see whether it all evens out in the end? But as I understand, either the default here or your ultimate rule, it doesn't care whether it all evens out in the end. It just says everybody keep the money. Well, bill-and-keep is a rule that tells you where to look to the source of where you're going to receive your compensation. In the normal course, when you're negotiating an agreement, you're receiving payments between the carriers. Bill-and-keep says we're not going to have these payments between the carriers anymore. Each carrier should look to its end-user customers for its compensation. So it's not a rule setting a rate. It's a rule telling you where to look for the source of your compensation. And, again, Congress in 252 expressly approved that. There any evidence as to what the result of bill-and-keep is? Well, we're in the midst of moving all traffic, including a lot of traffic that's not at issue here today, toward bill-and-keep in a big transit – in a big transition. Does that basically mean that you just charge for the originators, or does it mean you also charge for the terminations? You get the charge for any costs you incur, originating or termination. You look to your own customers to recover your costs. But when cell phones charge you when you get a call, that's – Right. So if I'm walking around town with my cell phone and I make a call and bill-and-keep is in place between the two carriers, then my wireless provider looks to me in pricing the service to recover its costs. So it's a rule to say where you go to look for your compensation. It is not a rule that precludes you from getting compensation. But it's a rule that precludes reciprocity. When the statute talks about reciprocity. Yes, but then the statute right under that – Yes, but the provision that you just read seems to be talking about, you know, just that you don't have to actually physically give the money across, but it doesn't suggest that if one company ends up paying $16 gazillion and the other ends up paying 3, that's fine. Well, if they could always negotiate with each other. The – again, the bill-and-keep rule was adopted in the 2001 order, which is not before the Court. They did not file a petition for review of that. But that is the default mechanism, Judge. Carriers can always negotiate and enter into agreements to exchange compensation. It's just if they don't for whatever reason, then the default rule is bill-and-keep. I see that my time is up. If there – Can I ask you one more question?  Yes, sir. Is this matter still before the Commission? You said that at one point several years ago. The particular order under review here, the T-Mobile order from 2005, that is right – that is here today before you. You have jurisdiction to rule on it. What we're saying is there was a 2011 comprehensive order. A gazillion people have challenged that. Something like 40 petitions for review were filed. That has been consolidated in the Tenth Circuit in Denver. We're in the middle of briefing. They've scheduled oral argument in November for that case. Trust me, there were many challenges to bill-and-keep in that case, and the Tenth Circuit will decide it. But I think it would be inappropriate for the Court to look at it here. But it's relevant to our system with – to our problem with regard – I think, unless you tell me why I'm wrong – with regard to the default on the rural exemption, in the sense that if the functional result of the rural exemption is that the only way these people can exercise their statutory right to not negotiate is to accept what's essentially a bill-and-keep payment, then if the bill-and-keep payment is itself not compliant with the statute, then it seems to me we have some more concern about the overriding of the tariff in the rural exemption situation. Well, the – in the wake of this order, they have a choice. They can negotiate a rate or they can look to their own customers. I will say, Judge, the commission did not – That's what I'm saying. So therefore, it's not irrelevant. It seems quite relevant. The commission did not adopt bill-and-keep as a default rule. It was never on the commission's books until 2011. Well, the question is, if you're looking to your customers to recover your costs, the rule says you can just not get compensation, which is the same thing, right? Well, this notion of looking to your customers to recover your costs, that's always been around for decades. You could always do that. That's nothing new. And people do it all the time. You also had the alternative of a tariff. I'm sorry? But you also had the alternative of a tariff. They did prior to 2005, but the commission determined – There's no answer to say you always had bill-and-keep, which you didn't have to use if you could have a tariff. Well, I think before 2005, you could have a tariff. You could try to negotiate and you could look to your own customers. And after the order, you have two options instead of three. But the rural LECs were supposed to have an advantage over the others, which was taken away. Well, I would say I want to – the rural exemption cuts against the grain of the thrust of the 96 Act. The 96 Act is all about increasing competition in private negotiations. Overall, I mean, it seems to me what's going on here is that the FCC is trying to come up with a sensible system, but it has a statute, and it's kind of pulling against the statute in trying to come up with what it thinks is sensible. And I have no doubt that what you've done may make lots of sense, but that's sort of not our job. Well, I think it comes down to the fundamental point that Congress in 251b-5 did not delineate the types of arrangements and did not unambiguously preclude the FCC from defining what those arrangements could be. And that's what the commission did here. It used its policy expertise and its experience looking at how this whole – all these disputes that arose, and it came up with a sensible solution. When you talk about looking at everything, can you tell me where it examined the effect of this rule on the rural LECs? That is not in the commission's order, Your Honor. It was raised briefly below, but not in a – we don't think in a significant way that it warranted a response. We don't think the rural exemption was affected by our order here. But it obviously was. So it didn't consider? It did not address the rural exemption in this work. Okay. If there are no further questions, I would respectfully ask the Court to affirm. Thank you. Thank you, counsel. May it please the Court, my name is Josh Branson. I'm representing CTIA as amicus. Judge Berzon, sorry, with respect to your question about the rural exemption, I would direct this Court to the CRC Time Warner order, which we cited at pages 12 to 14 of our brief, where the commission in a separate order explained at length that the rural exemption does not immunize rural carriers from compulsory arbitration under 252. And the reason is, is for the reason that Mr. Welch explained, which is that the actual text of section 251F1 only exempts rural carriers from the specific duties enumerated in subsection C. The duty we're talking about here is the duty of reciprocal compensation, which is in subsection V. So what the commission held in this CRC Time Warner order is that when a rural carrier is subject to the reciprocal compensation duty, that other carriers can still invoke the compulsory 252 arbitration process against rural carriers, and that in no way runs afoul or even implicates the rural exemption in 251F. So I would say even granting the premise that the T-Mobile order somehow forced rural carriers into the arbitration process, I don't think that that nullifies the rural exemption. The commission has squarely rejected that. Sotomayor, I see you're carefully saying arbitration. What about the negotiation obligation? The same conclusion holds. In the CRC Time Warner order, the commission held that the entire 252 process, negotiation, mediation, arbitration, remains available against rural carriers. Now, you're absolutely correct that you can't use that process to enforce subsection C duties, such as co-location, the more robust interconnection requirements, et cetera. But you can use it to enforce the subsection B process, such as reciprocal compensation. Wait a minute. C-1 is duty to negotiate. That's correct. But you're saying that's not within it. So what the commission held is that rural carriers are exempt from the duty to negotiate in good faith that's specifically enumerated in C-1. But that doesn't then go the extra step of exempting them wholesale from the 252 arbitration and negotiation process. And the reason the commission held that is that much of the 252 process is keyed in the more general duties in subsection B and A. And so another carrier is allowed to enforce that process, even though a rural carrier is not obligated to negotiate in good faith. And just to give you a sense of how that works, the commission has, you know, imbued the 251 C-1 duty you just referenced with some substantive content. So, for instance, if the parties are negotiating and one carrier says, I'm not going to put a change-of-law clause in the contract, the commission has said, that violates the duty to negotiate in good faith, because part of negotiating in good faith is including these types of clauses. So rural carriers are definitely exempt from that. But they're not exempt wholesale from the negotiation and arbitration process. And, you know, this is another reason that it's a bit complicated, Your Honor. I think that reading that order will explain why it's not really a problem that the T-Mobile order did not address the rural exemption, because the FCC has explained that. Kagan. I understand. I mean, I have the same reaction to what you're saying now as to everything else. I understand that the FCC has explained it, but that doesn't make it right. It may make it wise in some, you know, external world, but whether it makes it compliant with the statute is another question. And I don't understand, just off the top of my head, how, when it says, C-1 says the duty to negotiate in good faith in accord with Section 252 of this title, the particular terms and conditions to fulfill the duties described in Paragraphs 1 through 5 of Subsection B of this section, and then there's an exemption for rural entities from that obligation. That's not an exemption from that obligation. Well, I think it's an exemption from that obligation. Which is the duty to negotiate. So you don't have to negotiate in good faith in accordance with Section 252 to fulfill the duties described in Paragraphs 1 through 5. So how can you say you do have to negotiate? Because the 252 process has an alternate mechanism for compelling negotiation. And if you read the 252 process, it's keyed off of a request for negotiation. So what the commission held is that you might not have to negotiate in good faith as we've given that term, substantive content, but you do have to submit to the process more broadly. And it read, if you read Section 252, it speaks about the duties more generally, not just the 251C1 duty that you're looking at now, but it speaks about the duties in 251 more broadly. And the commission, I think, determined reasonably that if you conclude that the 252 process doesn't apply at all to rural exemptions, it would really hollow out the Act. It would undermine the pro-competitive policies enacted in the Act. I see my time is up, so unless there's any further questions. Thank you, Your Honor. May it please the Court, I have a couple of points that I would like to make in rebuttal. The first is CTIA has referred the Court to the CRC time-warner decision from 2011. In the Anaheim Memorial Hospital v. Shalala case in the Ninth Circuit in 1997, it was clearly stated that an agency's decision can be upheld only on the reasoning that's in that decision. To point to a 2011 order as what the FCC wishes it. It's not very sensible because if we send it back, we're just going to take the time-warner opinion and plug it into the middle of this and we're going to be in the same place. And the other point I wanted to make is tariffs have been held by States to be reciprocal arrangements. The States have imposed reciprocal responsibilities. If a carrier says, I'm charging two cents a minute for this call, they have held that two cents a minute is the same rate that carrier has to pay. So the States do have a check. It's not a, I think it was referred to as the lex or driving the bus. The States are in charge. And the rural exemption was referred to as a shield, but it was a shield created by Congress. I think the choice that was referred to is really a choice that you either receive no compensation or you negotiate. It's not as simple as a rural carrier says to a wireless provider, I'm going to negotiate with you. I'm going to negotiate a rate with you. For you, I'm waiving my rural exemption. It's a waiver of the rural exemption for any carrier who wants to come into that place and interconnect with a Ronan telephone company or a Hot Springs telephone company. Ginsburg. In other words, if they say, if the rural carrier offers to negotiate with one CMRS, they have to negotiate with everybody? They would have to negotiate with everyone, because the rural exemption would be gone. And where does that come from? The rural exemption only applies until you waive that right, until the State says you're no longer, you're no longer subject to the rural exemption. Well, that's until the State says it, but if you. If you request it. Right. If you self-request. If you're the rural carrier and you request it, then you're waiving it yourself. It would be a different thing. The State might decide if a wireless provider submitted the request. The State might decide then. But in this case, if the rural carrier is saying, I'm submitting this request, I'm asking for negotiations, I'm, I know I have this rural exemption, but I'm waiving it now so that I can get paid for this. And your position would be that they functionally have to do that, because otherwise they don't get paid. Right. Because the wireless providers were not running. With a bill and keep in footnote 57, with no compensation coming their way and no compensation owed by the wireless carriers, they were not rushing to the lex to request negotiations to have to pay something. Thank you, counsel. Thank you. The Court will take a five-minute recess before the next case. Thank you.
judges: Goodwin, Reinhardt, Berzon